IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| R. Alexander Acosta, Secretary of Labor, | : | Case No. 1:18-cv-590 |
| United States Department of Labor, | : | |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | |
| | : | Order Denying Defendants' Motion for |
| MICA Contracting, LLC, *et al.*, | : | Summary Judgment, Ruling on Motions |
| | : | to Strike, and Giving Notice of Intent to |
| Defendants. | : | Dismiss Without Prejudice Defendant |
| | : | Timothy Thompson |

This is a Fair Labor Standards Act ("FLSA") enforcement action brought by the

Secretary of Labor of the United States Department of Labor (the "Secretary"). The Secretary

alleges that Defendants MICA Contracting, LLC ("MICA"); J&E Builders, LLC ("J&E"); John

Wayne House; Sarah Elaine Merrick; and Timothy Thompson violated the FLSA by failing to

pay minimum wage and overtime and failing to keep required records. The Secretary seeks to

impose employer liability on the individual defendants and successor-in-interest liability on J&E.

This matter is before the Court on the very contentious Motion for Summary Judgment

(Doc. 74) filed by Defendants J&E, House, and Merrick.[1]  In addition to over eighty pages of

disputes of fact, the parties also dispute what evidence may be considered at this stage in the

litigation. To that end, Defendants have filed two Motions to Strike evidence relating to nine

declarations and referenced exhibits which were filed in support of Defendants' Response in

Opposition to Summary Judgment. Specifically, Defendants filed a Motion to Strike the

Declarations of Employee No. 1, Employee No. 2, and Employee No. 3 and Exhibit Thereto

(Doc. 90) and a Motion to Strike the Declarations and Exhibits of Wage and Hour Division

---

[1] For purposes of this Order, "Defendants" refers only to J&E, House, and Merrick.

Investigator Nikolai Bogomolov, Todd Haidet, Wayne McMillian, Mike Olding, Chris Kroger, and Gerardo Padilla (Doc. 91).

For the reasons that follow, Defendants' Motion for Summary Judgment (Doc. 74) will be **DENIED**. The Motion to Strike the Declarations of Employee No. 1, Employee No. 2, and Employee No. 3 and Exhibit Thereto (Doc. 90) will be **DENIED AS MOOT**.[2] The Motion to Strike the Declarations and Exhibits of Wage and Hour Division Investigator Nikolai Bogomolov, Todd Haidet, Wayne McMillian, Mike Olding, Chris Kroger, and Gerardo Padilla (Doc. 91) will be **GRANTED IN PART AND DENIED IN PART**.[3]

## I. BACKGROUND

### A. Procedural History

On August 21, 2018, R. Alexander Acosta,[4] then the Secretary of Labor of the United States Department of Labor, filed this FLSA enforcement action against Defendants MICA, J&E, Sarah Elaine Thompson a/k/a Elaine Merrick[5] ("Merrick"); Timothy Thompson[6]

---

[2] The Court did not consider the testimony of Employees No. 1, 2, or 3 for purposes of this Order. Therefore, the corresponding Motion to Strike (Doc. 90) is **DENIED AS MOOT**.

[3] The Court did not consider the testimony of Wayne McMillian, Mike Olding, or Chris Kroger for purposes of this Order. The objections to their declarations raised in Doc. 91 are **DENIED AS MOOT**.

[4] The current Secretary of Labor is Milton Al Stewart (effective January 20, 2021). The Court will refer to Plaintiff as the "Secretary" or "Plaintiff."

[5] The Secretary has acknowledged that Merrick filed for personal bankruptcy on April 20, 2017 in the U.S. Bankruptcy Court for the Southern District of Ohio, Case No. 17-11433. (Doc. 1 at PageID 3 n.1). Plaintiff alleges that the "Secretary's efforts to enforce any monetary portion of any judgment obtained against Defendants will be consistent with the Bankruptcy Code." (*Id.*) The Court previously denied Merrick's Motion to Dismiss on the basis of her bankruptcy filing. (Docs. 24, 26.)

[6] Defendant Timothy Thompson has not been served or waived service in this case. Pursuant to Federal Rule of Civ. P. 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). If the plaintiff shows "good cause for the failure," the court must extend the time for service for an appropriate period. *Id.* This action is over three years old. The case has progressed entirely without Timothy Thompson. **Plaintiff is hereby given NOTICE that the Court will**

2

("Thompson"); and John Wayne House ("House"). (Doc. 1.) The Secretary alleges that Defendants were employers under the FLSA, 29 U.S.C. § 203(d), and that J&E is a successor-in-interest to MICA. (*Id*. at PageID 3, 6.) The Secretary alleges Defendants violated Sections 6 and 15(a)(2) of the FLSA by failing to pay minimum wage to workers who were paid through a purported subcontractor, Amazing Interiors, LLC ("Amazing Interiors"), owned by non-party Gerardo Padilla. (*Id*. at PageID 7.) In addition, the Secretary alleges Defendants violated Sections 7 and 15(a)(2) of the FLSA by employing workers for more than forty hours per week without paying overtime. (*Id*. at PageID 8.) Finally, the Secretary alleges Defendants violated Sections 11(c) and 15(a)(5) of the FLSA by failing to make, keep, and preserve adequate and accurate records of their employees as required by 29 C.F.R. § 516. (*Id*. at PageID 9.) The Secretary seeks injunctive relief, unpaid minimum wage and overtime compensation, liquidated damages, pre-judgment interest, costs, and any other relief. (*Id*. at PageID 10.)

On December 31, 2018, the Clerk of Court entered an Entry of Default against MICA pursuant to Federal Rule of Civil Procedure 55(a). (Doc. 92.) The Secretary then filed a Motion for Default Judgment against MICA. The Court determined that the proper action was to keep the entry of default against MICA in place, but to delay judgment until the claims against Defendant J&E and other Defendants were resolved. (Doc. 39, 44.) The Motion was denied without prejudice to refiling. (Doc. 44.)

---

dismiss the case without prejudice against Defendant Timothy Thompson within 14 days of entry of this Order unless Plaintiff demonstrates good cause for its long overdue failure to serve Timothy Thompson.

On March 31, 2021, Defendants filed their Motion for Summary Judgment.[7] (Doc. 84.) The Secretary responded in opposition, and Defendants replied. (Docs. 85, 94.) On June 18, 2021, Defendants filed two Motions to Strike. (Docs. 90, 91.) The Secretary responded in opposition, and Defendants replied. (Docs. 95, 97, 98, 99.) All Motions are ripe and ready for adjudication.

### B. Facts[8]

This is a very contentious case. The numerous disputes of fact, only some of which are highlighted herein, render summary judgment inappropriate.[9] Most significantly, there are material disputes of fact over whether Padilla and workers paid by Amazing Interiors were employees of J&E and whether Merrick exercised control over J&E so as to be an employer.

MICA was a general contracting business that operated from 2012 to March 2017 whose services included drywall and framing. Merrick was the owner and Chief Financial Officer of MICA. She determined employee wages, hired subcontractors, and took draws from the company at her discretion. (Merrick Admin. Dep., Doc. 77 at PageID 3980–82.) MICA used subcontractors to supplement its workforce. (*Id*.)

J&E began operating around the time MICA ceased operating in March 2017 and was owned by House. J&E performed general contracting, including drywall, framing, painting, Gyp-Crete, general trades labor, insulation, carpentry and siding. (House Admin. Dep., Doc. 72

---

[7] Although the Defendants move for summary judgment on "all claims," the Motion does not address alleged overtime violations by MICA, individual liability for injunctive relief, recordkeeping violations, or overtime violations related to J&E's admitted employees. (*See* Motion, Doc. 74, *and* Response, Doc. 85 at PageID 5102 n.1.)

[8] The facts drawn are derived from Defendants' Statement of Undisputed Facts (Doc. 74-1) and Plaintiffs' Response to Defendants' Proposed Undisputed Facts (Doc. 83), as well as Plaintiffs' Proposed Disputed Facts (Doc. 84) and Defendants' Response to the Secretary's Proposed Disputed Issues of Fact (Doc. 93). To the extent a fact is deemed admitted, the Court will not cite to the record.

[9] For a complete record of all disputed facts, *see* Docs. 74-1, 83, 84, and 93.

at PageID 3601.) J&E relied upon employees and subcontractors for framing, drywall, hanging, finishing, and insulation. (*Id*. at PageID 3602–03.)

The parties dispute what, if any, overlap existed between J&E and MICA, as well as Merrick's role in running J&E. During the time of J&E's operation—March 2017 until November 2017—Merrick was in a relationship with and lived with House. After MICA ceased operations, Merrick was employed at J&E as an office manager and then project manager. She denies having ownership interest in J&E. (Merrick Admin. Dep., Doc. 77 at PageID 4028–29.) House, though the owner of J&E, had a full-time day job unrelated to J&E and split his time "50/50" between his full-time job and J&E. (House Admin. Dep., Doc. 76 at PageID 3935–36.) Many of the same employees worked for J&E as did for MICA, including "Flaco," a foreman for J&E and a chief foreman for MICA, and "Manuel," a foreman for J&E and chief foreman for MICA. (*Id*. at PageID 3868; Merrick Admin. Dep., Doc. 77 at PageID 4089; 3977–80.)

Gerardo Padilla attested that he worked for "Elaine" and used his company name, Amazing Interiors, LLC[10] ("Amazing Interiors"), to pay subcontractors he brought to J&E job sites who also worked for "Elaine's workforce." (Padilla Dec., Doc. 81-5 at PageID 4957–59.) He attested that he called Merrick about working for her and she asked if he knew "any other guys" like "drywall hangers and finishers." (*Id.* at PageID 4957.) "I said that I needed to make a few phone calls. I did and that is how I got a few of us to work for Elaine." (*Id*.) According to him, Amazing Interiors "was a business name I used at times for many years" but he was not using the name at the time he "got the workers to work for Elaine." (*Id*.) He claims that "[o]nce

---

[10] Amazing Interiors is an Ohio limited liability company owned and operated by its sole proprietor, Padilla. (Amazing Interiors, LLC Subpoena Response, Doc. 73-3 at PageID 3718.)

I started working for Elaine, I used the Amazing Interiors name to pay the workers I brought to join Elaine's workforce." (*Id*.)

He attested that Merrick directed J&E employees and subcontractors where and when to work and controlled payroll for employees and subcontractors. (*Id.*) Text message exchanges between Padilla and Merrick show the two discussing multiple topics including when Padilla would get paid, requests for Padilla's hours, Padilla's hours worked, Padilla's pace of work, whether he needed more tools, payment for work, and disputes over the number of hours worked. (Text Messages, Doc. 71-4).

Padilla attested that "Flaco kept a record of all our work hours, including my work hours and the work hours of the workers I brought to work for Elaine. The workers I brought to J&E reported their hours to me, and I invoiced Elaine every week. In those instances in which Elaine did not pay me for all hours worked by those workers, she told me the hours that I reported did not match the hours that Flaco had kept for them." (Padilla Dec., Doc. 81-5 at PageID 4959.) Merrick made Padilla "redo" his hours and only paid him and other workers based on the number of hours Flaco reported. (*Id*.) Merrick was "always the one who gave me the check or deposited money" and did not pay him for any work done on the Empower Media project. (*Id*.)

Padilla attested that he and the workers he provided "performed the same drywall work tasks as Elaine's other workers." (*Id.* at PageID 4958.) According to him, the workers had the same skills, were supervised by Merrick's foremen, and had to follow J&E foremen's orders. (*Id*.) "They [the J&E foremen] told us when to start and when to go home. They told us what job tasks to do and we did as we were instructed, hang, finish, etc. We did not have the discretion to come and leave as we pleased. The J&E foremen told us what to do on a daily

6

basis." (*Id.*)  He also attested that he did not have to pay for materials or equipment.  (*Id.*)  The only items workers provided were their own hand tools.  (*Id.*)

On the other hand, two J&E foremen attested that they did not direct the subcontractors. Manuel Lemus attested that he previously worked for MICA and began working on February 22, 2017 as a foreman for J&E.  (Doc. 73-2 at PageID 3695.)  As a foreman for J&E, he worked on-site on J&E projects and recalls subcontractors working on the J&E job sites where he was the foreman to hang and finish drywall.  (*Id.*)  However, he did not give any instruction to subcontractors because they already knew how to do the work.  (*Id.*)  Lemus "did not tell [the subcontractors] how to do the work they were supposed to complete.  (*Id.*)  The subcontractors would decide who to bring on site for the job and how many people to bring on site to do the job."  (*Id.*)  He "did not supervise or oversee any work performed by any subcontractor on any J&E project.  I did not check or keep track of any of the work done by J&E's subcontractors because they knew what to do and I was working on other tasks."  (*Id.*)

Similarly, Antonio Lemus-Cervantes attested that he previously worked for MICA until it went out of business and then began working for J&E on February 22, 2017 as a lead estimator. (Doc. 73-1 at PageID 3691.)  He submitted a resume to John House after seeing an advertisement on Glassdoor.  (*Id.*)  As lead estimator, Lemus found subcontractors to do the job, supervised foremen, and helped on projects.  (*Id.*)  "Hanging and finishing drywall or any other task outside of framing was only done by subcontractors.  J&E's foreman would track the work of the subcontractors for quality control and billing purposes to make sure the subcontractor was supposed to do was done."  (*Id.* at PageID 3692.)  J&E did not train, supervise, or control the subcontractors.  (*Id.*)  He attested that Padilla, and his company Amazing Interiors, were subcontractors for J&E.  (*Id.*)

7

J&E completed eleven projects before ceasing operations, including two projects on which MICA had previously already started work but was unable to finish (Livingston Health and Sheakley Center) and two projects for which MICA had won a bid but did not begin work (Empower Market Media and Homeport Hamilton Crossing). (Merrick Admin Dep., Doc. 77 at PageID 4034, 4036–40.) There is some evidence that J&E presented itself as a continuation of MICA. For instance, Todd Haidet, the Controller and Vice President of Administration for Oswald Company, the construction manager for the Livingston Health project and Empower Media project, attested that Merrick approached Oswald and said "there was a change in the companies and J&E would finish the work started by MICA." (Doc. 81-1 at PageID 4949.) Because Oswald was concerned about warranties for the work, it incorporated successor-in-interest language into the contract with J&E to ensure it was named as a successor to MICA and that J&E would warranty the whole job.[11] (*Id.*) Haidet, who worked for Oswald as a construction contractor, attested he primarily dealt with Merrick and observed Merrick to be in charge. (*See, e.g., id.* at PageID 4949.)

J&E used the same address as MICA for a period of time.[12] J&E utilized "MICA" scaffolding on jobsites, although it denies having purchased any equipment from MICA. (Bogomolov Dec., Doc. 81-11 at PageID 5046; Merrick Admin. Dep., Doc. 77 at PageID 4043–44; House Dep., Doc. 76 at PageID 3853–54.)

---

[11] MICA completed about half of the work, and then J&E finished the job. The daily safety reports submitted to Oswald by J&E listed the same crews and foremen that were listed on the Reports submitted to Oswald by MICA. (*Id.*)

[12] MICA's address for its 2016 tax return and a Termination Agreement was listed as 912 Woodlyn Drive North, Cincinnati, Ohio 45230. (Doc. 80-5 at PageID 4735; Doc. 80-7 at PageID 4747.) 912 Woodlyn Drive North, Cincinnati, Ohio 45230 was the address J&E used. (Doc. 80-9 at PageID 4776.)

## II.    MOTIONS TO STRIKE

### A.  Standard of Law

The Court first will address the pending Motions to Strike.  In moving for summary

judgment, Defendants argue Padilla and the subcontractors are not employees of  J&E under the

FLSA; that Merrick is not an "employer" under the FLSA; and that MICA is not a successor-in-

interest to J&E.  Central to these issues are how much control J&E and Merrick exerted over the

subcontractors alleged to be employees.  As such, the Secretary submitted several declarations in

Response to Defendants' Motion for Summary Judgment from individuals who attested to their

knowledge about these topics.

Defendants move to strike a total of nine sworn statements and exhibits.[13]  The Court

only considered the testimony from three declarations and therefore will only address objections

to those witnesses: Gerardo Padilla (Doc. 81-5); Todd Haidet (Doc. 81-1); and Wage and Hour

Division Investigator Nikolai Bogomolov (Doc. 81-11) and the exhibits attached or referenced

throughout.   Defendants argue these witnesses' declarations are improper because they contain

hearsay, are prejudicial and lack probative value, conclusory without a factual basis, and rely

upon inadmissible or unauthenticated documents.

In order to be considered by the Court on a motion for summary judgment, an affidavit

must: (1) be made on personal knowledge; (2) set forth such facts as would be admissible in

evidence at the time of trial; and (3) show that the affiant is competent to testify to the matters

---

[13] Defendants also argue that pre-litigation, administrative depositions taken by the Secretary of Labor are "inadmissible against MICA."  (Doc. 94 at PageID 5217.)  Initially, MICA has not moved for summary judgment, and MICA has a default judgment against it.  Regardless, prior sworn testimony is admissible under Fed. R. Civ. P. 56 to the extent that the deponent's testimony was competent, based on personal knowledge, and set out facts that will be admissible at trial.

stated. Fed. R. Civ. P. 56(c)(4). A court cannot rely on inadmissible hearsay at summary judgment where hearsay cannot be reduced to an admissible form. *Wylie & SonsLandscaping, LLC v. FedEx Ground Package Sys., Inc.*, 696 F. App'x 717, 721 (6th Cir. 2017) (citing *Hoover v. Walsh*, 682 F.3d 481, 491 n.34 (6th Cir. 2012)). "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted." *Wylie*, 696 F. App'x at 721 (citing Fed. R. Evid. 801(c)).

"An affidavit that does not satisfy [the Fed. R. Civ. P. 56(c)(4)[14]] requirements is subject to a motion to strike and will not be considered by the Court in ruling upon a motion for summary judgment." *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007) (citing *Reddy v. Good Samaritan Hosp. & Health Ctr.,* 137 F.Supp.2d 948, 954 (S.D. Ohio 2000)). "In resolving a motion to strike, the Court should use 'a scalpel, not a butcher knife.'" *Id*. (citing *Perez v. Volvo Car Corp.,* 247 F.3d 303, 315–16 (1st Cir. 2001)).

### B. Defendants' Motions

The Court will first consider the Declaration of Gerardo Padilla, which describes Padilla's experience working with Merrick and J&E and the work performed by individuals alleged to be employees of Merrick and J&E. It will next turn to Todd Haidet's Declaration, which describes Haidet's impressions from his personal experience working with Merrick and J&E as a general contractor. Lastly, the Court will turn to Department of Labor Investigator Bogomolov's Declaration. Bogomolov investigated whether MICA and J&E violated the FLSA.

---

[14] Prior to the 2010 Amendment to Federal Rule of Civil Procedure 56, subsection (e) set forth the applicable affidavit requirements, which have been largely carried forward in the current subsection (c)(4) of Rule 56.

Each witness offers testimony about underlying disputed issues in this case that have relevance to the Court's summary judgment ruling.

### 1. Gerardo Padilla

Defendants argue that Gerardo Padilla's Declaration (Doc. 81-5) should be struck because it contains hearsay, is prejudicial, conclusory, and demonstrates a lack of personal knowledge.[15]  Specifically, Defendants object to Padilla's references to working for Elaine, joining Elaine's workforce, Elaine paying money, contracting with Elaine, and Elaine being his boss.  Defendants argue these statements make conclusory legal arguments about Merrick's status as an "employer."  The objection is overruled.  The Court finds that these are statements based upon Padilla's personal experience working with Merrick and his impressions of that relationship.  The observations are relevant to the Court's consideration of Merrick's role with J&E and whether she is an employer under the FLSA.  Padilla's statements are not "conclusory" as they are based on his impression and personal observations.

Defendants also object on hearsay grounds to the following statements made by Merrick and J&E foremen:[16]

- "Elaine told me how many people she needed and where she needed them."
- "She told me the hours that I reported did not match the hours that Flaco had kept for them."
- "They [J&E foremen] told us when to start and when to go home.  They told us what job tasks to do and we did as we were instructed, hang, finish, etc. We did not have the discretion to come and leave as we pleased.  The J&E foremen told us what to do on a daily basis."

---

[15] Defendants suggest for the first time in their Reply brief that Padilla's Declaration is itself inadmissible hearsay, and that the statements contained within it are hearsay within hearsay.  Rule 56 permits affidavits to be considered as evidence at the summary judgment stage.

[16] The Court agrees with the Defendants that that the statement "I was told that Elaine Thompson ('Elaine') was looking for drywall workers" is hearsay and should be stricken.  The statement is an out of court statement, speaker unknown, offered to prove the truth of the matter asserted.  The Court will therefore not consider it.

The objections are overruled. The statements are not hearsay, because they are party admissions and statements made by Defendants' employees.[17] *See* Fed. R. Evid. 801(d)(2)(A); Fed. R. Evid. 801(d)(2)(D). Additionally, the statements are not offered to prove the underlying truth of how many people Elaine needed and where they worked, but that Merrick and or J&E foreman exercised a level of control at the worksite, which is relevant to the issue of employer liability and employee status under the FLSA.

Defendants also argue that Padilla lacks personal knowledge to aver that Elaine failed to pay him for work on the Empower job site or that he does not know John House. Defendants attempt to disprove the statements by arguing the Court should examine Padilla's bank statements. Whether Padilla's statements are accurate, however, go to the weight of the evidence and Padilla's credibility as opposed to the evidence's admissibility.

Finally, Defendants object to Padilla's authenticating text message exchanges between himself and Merrick. As the Secretary points out, Merrick testified under oath that the text messages are authentic. (Merrick Dep., Doc. 71 at PageID 3492–93.) Further, the text messages are not hearsay because they are Merrick's own statements, regardless of the electronic medium through which they were sent. *See United States v. Dunnican,* 961 F.3d 859, 872–73 (6th Cir. 2020) (district court did not abuse its discretion in admitting party statement text-message conversations into evidence).

For these reasons, Defendants' objections to Padilla's Declaration are **GRANTED IN PART AND DENIED IN PART**.

---

[17] Defendants argue that the J&E employees are non-management and non-parties, and so their statements cannot be admissible under Fed. R. Evid. 801(d)(2)(A). But an opposing party's statement includes one that "was made by the party's agent or employee on a matter within the scope of that relationship while it existed." Fed. R. Evid. 801(d)(2)(D).

### 2. Nikolai Bogomolov

In his Declaration, Nikolai Bogomolov attests that he is an investigator employed by the Wage and Hour Division of the United States Department of Labor and that he investigated MICA Contracting, LLC as well as J&E, which was a "spin-off" of the MICA investigation. (Doc. 81-11 at PageID 5044.) Bogomolov investigated MICA's compliance with minimum wage, overtime, and recordkeeping provisions of the FLSA and reviewed numerous documents, including payroll records and timesheets provided by MICA, as well as other documents provided by MICA employees and others. (*Id*.) "The investigation of MICA determined that MICA violated the overtime provisions of the FLSA and owes $66,200.95 in overtime back wages, plus an equal amount in liquidated damages, for the period August 22, 2016 to approximately February 27, 2017." (*Id*. at PageID 5045.) Of the back wages owed to MICA employees, a portion is owed to employees paid through Jimenez Construction, LLC and the other portion is owed to employees paid directly by J&E as "purported independent contractors." (*Id*.)

As part of the investigation, Bogomolov also investigated J&E's compliance with minimum wage, overtime, and recordkeeping provisions of the FLSA and reviewed numerous documents, including payroll records and timesheets provided by J&E as well as documents provided by J&E employees and other individuals. (*Id*.) "The investigation of J&E determined that J&E violated the minimum wage and overtime provisions of the FLSA, and owes $55,680.50 in minimum wage and overtime back wages, plus an[ ] equal amount in liquidated damages, for the period of approximately February 27, 2017 to approximately July 16, 2017." (*Id.*) Of the back wages owed to J&E employees, approximately half is owed to J&E employees

13

and the other half to Padilla and employees whom he provided to J&E and who were paid through him.  (*Id*.)

Bogomolov visited the worksite of Empower Media and observed J&E employees using scaffolding that had the word "MICA" written on it.  (*Id*. at PageID 5046.)  He attested that the exhibit labeled "MICA Checks" (Doc. 80-2) are authentic copies of documents sent to him via email by Merrick on November 18, 2017 with bank account information redacted.  (*Id*.)  He also attested that the document labeled "Back Wage Computations" (Doc. 8014) are true and accurate copies of the back wage computation worksheets showing the back wages owed to J&E employees, MICA employees, and other workers.  (*Id*. at PageID 5045.)  The exhibits labeled "Empower Safety Logs Annotated" (Doc. 80-3) and Livingston Safety Logs (Doc. 80-4) are authentic copies of documents produced to the Department of Labor by Oswald Company, Inc. in response to a subpoena from the Department of Labor.  (*Id*. at PageID 5046.)  The exhibit labeled "Empower Safety Logs Annotated" has been annotated with red boxes indicating workers paid through Padilla.  (*Id*.)

Defendants object to Bogomolov offering any testimony about whether MICA and J&E violated the FLSA or any amount of alleged damages owed on the basis that this is an improper legal or expert opinion.  This objection is overruled.  The declaration summarizes the Department of Labor's FLSA investigation involving MICA and J&E, with bearing on the individual liability as well.  The results are not determinative of the legal outcome of this case, but the wage and hour investigation and its findings are highly relevant to the underlying issues in this action, including whether J&E had notice of FLSA liability and whether Merrick is an employer.  Further, the Court does not consider the amount of damages at this point, but the investigator's computations will likely be admissible and helpful testimony at trial.  Furthermore,

Bogomolov submitted a similar Declaration attached to the Secretary's Motion for Default Judgment against MICA, which was considered by the Court in ruling on default judgment against MICA. (*See* Doc. 39 (citing Bogomolov Declaration, Doc. 34-1.)) Thus, some of this testimony is already in evidence.

Defendants also argue that Bogomolov does not properly authenticate the back wage worksheets and daily safety logs and that they constitute hearsay. This objection is overruled. Bogomolov averred that he conducted the investigations of both MICA and J&E and therefore, the Court finds that he has knowledge of the back wage computations drafted in the course of that investigation. *See Garcia-Garcia v. Costco Wholesale Corp*., 878 F.3d 411, 419 (1st Cir. 2017) (accepting affidavits where it was readily apparent, and easily inferred, that the statements were made with personal knowledge). Further, the computations are not hearsay, as it is easily understood from reading the declaration as a whole that Bogomolov has personal knowledge of the FLSA investigation he conducted and the results of that investigation, including the damages calculations. The computations would likely also be admissible as a business record of the Department of Labor. *See* Fed. R. Evid. 803(6).

The Court also finds that the daily safety logs were properly authenticated by other witnesses and would already be in evidence. The red annotations are not offered as evidence but as demonstrative aids to highlight which workers listed in the logs alongside J&E's admitted employees were purported subcontractors. The Court does not rely upon the annotations, but in any event, would permit these based on this witness's underlying knowledge of the investigation and the fact that the original exhibit is able to be authenticated by another witness.

For these reasons, the objections to Bogomolov's Declaration are **OVERRULED**.

15

### 3. Todd Haidet

In his Declaration, Todd Haidet attests that he was Controller and Vice President of Administration for Oswald Company, a construction contractor in Cincinnati, Ohio. (Doc. 81-1 at PageID 4948.) He attests that Elaine Merrick and "her" companies, MICA and J&E, were drywall subcontractors on two Oswald projects in 2016, the Livingston Health and Empower Media projects. (*Id*.) It was his understanding that "Elaine made most of the decisions for MICA and J&E." (*Id*.) According to him, "Elaine was involved in the daily operations and decision making of J&E" although she was technically an employee. (*Id*. at PageID 4949.) He "dealt with her for any job-related issues, including discussions regarding the work to be done, deadlines, negotiation of pricing and labor, schedules and rates." (*Id*.) He attests that "MICA transitioned into J&E" and after she divorced her husband, she formed J&E with John House, with the "J" standing for John and "E" standing for Elaine.[18] (*Id*.)

Haidet further attests:

Elaine came to us and said there was a change in the companies and J&E would finish the work started by MICA. We at Oswald had concerns about warranties for the work MICA had done. That's why we incorporated the successor in interest language into the contract with J&E to ensure they were named as a successor to MICA and that J&E would warranty the whole job, regardless of who had done the work.

(*Id*.) According to him, "Elaine was really running J&E and making all the decisions" and "answered all questions about bills and scheduling, and she completed all of the daily transactions." (*Id*.)

---

[18] The Court does not see how the witness has conveyed his personal knowledge of the meaning of the name "J&E" and finds that this testimony is properly excluded.

16

Haidet attests that in October 2017, he responded to a Department of Labor subpoena on behalf of Oswald, and the documents he identified are accurate copies of daily safety reports completed by MICA and J&E foremen and given to Oswald, as well as a termination agreement between Premier Health and MICA.  (*Id.*)  He supplied copies of these documents to the Department of Labor in response to the subpoena.  (*Id*.)  The documents were maintained in the regular course and scope of business of Oswald and were prepared by individuals with knowledge of the acts, events, conditions, opinions, or transactions recorded or from information transmitted by a person with knowledge of these facts to be included in the records, and the records were made at or near the time of the acts, conditions, or events which they intend to convey.  (*Id*. at PageID 4949–50.)

Defendants argue the following statements are conclusory and inadmissible: references to "Sarah Elaine Thomson ("Elaine") and her companies…;" that it was Haidet's understanding that "Elaine made most of the decisions for MICA and J&E;" that Elaine was "technically a J&E employee;" and that "MICA transitioned into J&E" or "Elaine formed J&E with John."  It also objects to the statements: "Elaine was really running J&E and making all the decisions. Elaine answered all the questions about billing and scheduling and she completed all of the daily transactions."  The objections are overruled.  The Court finds that these statements are relevant to the issue of whether Merrick was exercising control over J&E for purposes of FLSA employer liability and are based on Haidet's impressions of personally working with Merrick and J&E.

Defendants argue that Haidet's statement that "Elaine came to us and said there was a change in the companies and J&E would finish the work started by MICA" constitutes hearsay. "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted*." Wylie & SonsLandscaping, LLC*, 696 F. App'x at 721; Fed. R. Evid. 801(c).   An exception to the hearsay

rule is a party's own statement. "Rule 801(d)(2)(A) provides that a party's own statement offered against the party is, by definition, not hearsay." *Bondie v. Bic Corp.*, 947 F.2d 1531, 1534 (6th Cir. 1991) (citing Fed. R. Evid. 801(d)(2)(A)). Merrick's statement qualifies as a party statement.

Defendants argue that Haidet does not have personal knowledge and cannot authenticate the daily safety reports submitted to Oswald by J&E because they were prepared by MICA and J&E foremen and given to Oswald. Defendants also argue that the statement that the daily safety reports contained the "same crews and foreman" is vague and prejudicial. The daily safety reports were maintained by Oswald and created by J&E. An employee outside of a business may lay an authenticating foundation where the witness has knowledge of the business's regular practice. *United States v. Dunnican*, 961 F.3d 859, 872 (6th Cir. 2015); Fed. R. Evid. 803(b)(6); Fed R. Evid. 902(11). Haidet sufficiently demonstrates this by describing how the documents were maintained—they were accurate copies of the reports produced to Oswald by the Defendants—and Defendants do not dispute this assertion.[19] The statement about using the "same crews and foreman" is not prejudicial. The objection is overruled. The Court takes this at limited value and only for the impression that the workforce was generally similar, not that the daily rosters of employees was identical, as those documents speak for themselves.

For these reasons, Defendants' objections to the consideration of Haidet's Declaration are **GRANTED IN PART AND DENIED IN PART**.

---

[19] Further, as there is no dispute that the documents were prepared by MICA and J&E employees, they would be admissible as statements of a party opponent under Fed. R. Evid. 801(d)(2).

### III.    MOTION FOR SUMMARY JUDGMENT

Having addressed threshold evidentiary issues, the Court will now consider the merits of Defendants' Motion for Summary Judgment.  Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden of showing that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 585–87; *Provenzano*, 663 F.3d at 811.

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).   The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  A genuine issue for trial exists when there is sufficient "evidence on which the jury could

reasonably find for the [nonmoving party]." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Defendants J&E, House, and Merrick jointly move for summary judgment on the bases that Padilla and workers paid by Amazing Interiors are not employees under the FLSA; that Merrick has no individual liability as an employer; and that J&E is not a successor-in-interest to MICA. Because the Motion does not address all claims, the Court construes this as a Motion for Partial Summary Judgment. There are numerous disputes of fact rendering summary judgment inappropriate.

### A. Definition of "Employee" under the FLSA

The Secretary asserts that Padilla and the group of workers paid by Amazing Interiors were employees of J&E. According to the Secretary, the subcontractors joined the J&E workforce through Padilla when Defendants did not have enough hourly employees available and needed to supplement their workforce. Padilla and the subcontractors performed the same work as J&E's admitted employees, and J&E directly supervised the subcontractors. Padilla was the "go-between" that J&E used to evade its minimum wage and overtime obligations. Defendants move for summary judgment on the basis that these workers were not employees. However, there are many genuine disputes of fact rendering summary judgment inappropriate.

"Under the FLSA, only employees are entitled to overtime and minimum wage compensation." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (summary judgment denied due to questions of fact over whether workers were independent contractors or employees). Independent contractors, on the other hand, "do not enjoy FLSA's protections." *Id.* The FLSA applies to "employees," who are defined as "any individual[s] employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" is defined as "any person acting directly or

indirectly in the interest of an employer in relation to an employee." *Id*. at § 203(d). The term "employ" is defined as "to suffer or permit to work." *Id*. at § 203(g). "These are wide-ranging definitions; indeed, the Supreme Court has stated that '[a] broader or more comprehensive coverage of employees . . . would be difficult to frame.'" *Acosta v. Cathedral Buffet*, 887 F.3d 761, 765 (6th Cir. 2018) (citing *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945)). "The statutory language 'stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" *Id*. (citing *Mendel v. City of Gibraltar*, 727 F.3d 565, 569 (6th Cir. 2013)).

Courts in the Sixth Circuit consider an employee under the FLSA to be a worker who, as a matter of "economic reality," is dependent upon the business to which he or she renders service as determined by the following factors: (1) the permanency of the relationship between the parties; (2) the degree of skill required for the rendering of the services; (3) the worker's investment in equipment or materials for the task; (4) the worker's opportunity for profit or loss, depending upon his skill; (5) the degree of the alleged employer's right to control the manner in which the work is performed; and (6) whether the service rendered is an integral part of the alleged employer's business. *Keller*, 781 F.3d at 807 (citing *Donovan v. Brandel*, 736 F.2d 1114, 1117 & n.5 (6th Cir. 1984)). Courts have also considered the company's authority to hire or fire the worker and whether the company maintained the worker's employment records. *Id*. (citing *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012)). "None of these factors is determinative on its own, and each must be considered with an eye toward the ultimate question—the workers' economic dependence on or independence from the alleged employer." *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019) (*quoting Keller,* 781 F.3d at 807) (internal citations removed)).

21

The parties' labeling a worker an "employee" or "independent contractor" will not be determinative as to the status of the worker, and the Court must look past the parties' labels to the economic reality relationship.  *Id*. (quoting *Keller*, 781 F.3d at 804).  Whether an individual is an "employee" under the FLSA is a mixed question of law and fact.  *Keller*, 781 F.3d at 806 (citing *Lilley v. BTM Corp*., 958 F.2d 746, 750 n.1 (6th Cir. 1992) (employee status was a question of fact for the jury to resolve)).

### 1.  Degree of Skill Required

The Court will consider the six economic realty factors in turn, beginning with degree of skill required.  Most important to the "degree of skill" factor is whether Defendants' profits increased because of the "initiative, judgment[,] or foresight of the typical independent contractor," or whether the work "was more like piecework."  *Id.* at 809 (citing *Rutherford v. McComb,* 331 U.S. 722, 730 (1947)).  When the experience of hanging drywall is gained independently of training or control by an alleged employer, which is the case here, the skill of hanging drywall has been found to indicate an independent contractor relationship.  *See, e.g., Acosta v. Peregrino*, No. 3:17-cv-01381, 2020 WL 5995049, at *7 (M.D. Tenn. Oct. 9, 2020) (finding a dispute of fact regarding the level of skill needed to perform work).  The Secretary asserts that there is no record evidence to demonstrate that Defendants required any particular skill, experience, or training of its workers.  Merrick testified that she contacted Padilla because he came recommended. (Doc. 71 at PageID 3451–3464.)  Neither party has identified evidence that J&E or Merrick provided training to Padilla and/or the subcontractors. On the record, this factor favors independent contractor status.

## 2. Workers' Investment in Equipment or Materials

The next factor is whether the worker made a significant capital investment. This factor "is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the [company] to accomplish the task." *Keller*, 781 F.3d at 810 (citing *Brandel,* 736 F.2d at 1119). A court must compare the worker's investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance. *Id*. The worker's capital investment is considered for evidence of economic independence. *Id*. The capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the landowner to accomplish the tasks. *Donovan v. Brandel*, 736 F.2d 1114, 1118–19 (6th Cir. 1984).

Padilla and the subcontractors brought hand tools on the work site, such as hammers and saws. J&E provided finishing materials, such as mud and tape, but not tools, identification, uniforms, or scaffolding. (Merrick Dep., Doc. 71 at PageID 3480; House Dep., Doc. 72 at PageID 3625–27.) J&E also used MICA scaffolding. The Secretary emphasizes the disparity in capital investments, as J&E spent over $850,000 on business expenses (excluding wages/contract labor), including $663,641 on "job materials" and $73,662 on "equipment rental." Comparatively, the cost of hand tools would be significantly less, but neither party identified evidence regarding the cost of workers' hand tools.

Defendants argue that the cost of scaffolding and other equipment would be on any job site, and therefore is not determinative of a big disparity. Defendants also assert that Amazing Interiors had its own insurance policies, bank accounts, and tools. It is unclear to what extent

23

Padilla and subcontractors utilized scaffolding and other materials, and how extensively they relied on their hand tools to complete job tasks. Thus, questions of fact remain as to this factor.

### 3. Workers' Opportunity for Profit or Loss

In evaluating the worker's opportunity for profits and losses, the Court considers whether workers had an opportunity for greater profits based on managerial and technical skills. *Keller*, 781 F.3d at 812 (citing *Brandel*, 736 F.2d at 1119). J&E maintains that Padilla and the subcontractors were in control of profits and losses, because if the subcontractor decided to bring a more experienced or larger crew, they would complete work faster and could obtain other opportunities, or, if the project required more hours, they would be paid more.

J&E paid Padilla and the subcontractors on an hourly basis: $23 per hour worked by both Padilla and the subcontractors, with no premium for overtime hours. (Padilla Dec., Doc. 81-5 at PageID 4957–59.) Padilla asserts that from March until July 2017, Padilla and the subcontractors worked exclusively for Merrick / J&E, and during that time, Padilla did not advertise, bid, or solicit work. (*Id.*) Amazing Interiors received payments totaling $78,392 in 2017 from J&E, but Defendants claim that based on Padilla's bank account statement, that amount accounts for only a portion of Amazing Interiors's overall revenue. (Bank Statement, Doc. 73-3 at PageID 3738–47; Payment List, Doc. 71-3 at PageID 2784; Motion for Summary Judgment, Doc. 74 at PageID 3794–95.) According to Antonio Lemus-Cervantes, a foreman for MICA and lead estimator for J&E, Padilla did not work exclusively for J&E. (Lemus-Cervantes Dec., Doc. 71-3 at PageID 3692.)

If Padilla and the subcontractors worked exclusively for Defendants and were paid a set rate per hour ($23/hour), they were not exercising managerial skill in being able to increase profits by working elsewhere. "Decreased pay from working fewer hours does not qualify as a

24

loss." *See Off Duty Police*, 915 F.3d at 1059. However, disputes of fact remain. Whether Padilla and the subcontractors worked on different job sites or worked exclusively for Defendants is a dispute of fact necessary to evaluating this factor. Questions of fact also remain about the sources of revenue in Padilla's bank account and his general credibility.

### 4. Degree of Employer's Right to Control Work

The next factor is whether Defendants controlled Padilla and the subcontractors' work. *Keller*, 781 F.3d at 814. Questions of fact exist over how much control Defendants maintained over Padilla and the subcontractors. For instance, J&E foremen completed daily safety reports listing J&E as the "subcontractor," and included a list of all workers on site. These logs listed J&E's admitted employees alongside the subcontractors without differentiating between them. (Daily safety reports, Doc. 80-3 at PageID 4548–79.) Jose Luis Lemus Cervantes a/k/a/ "Flaco" was a project manager for J&E, and prior to that worked for MICA. (Jose Luis Lemus Cervantes Dep., Doc. 79 at PageID 4361–62.) He testified that he "probably" supervised Padilla's subcontractors and that "we worked together when they show up on the job." (*Id.* at PageID 4489–90.) Padilla attests that he and the subcontractors had the same skills, hanging and finishing drywall, as "Elaine's other workers" and the "same people supervised all of us." (Padilla Dec., Doc. 81-5 at PageID 4958.) He attests that everyone was supervised by "Elaine's foremen, Flaco, his brother Celso, and their cousin Danny Marquez" and "we all had to follow J&E foremen's orders" including when to start and stop work and what tasks to do. (*Id.*) Manuel Lemus, a foreman for J&E who previously worked for MICA, attested that he did not supervise subcontractors. (Manuel Lemus Dec., Doc. 73-2 at PageID 3695.) Thus, a significant question of fact remains as to how much control J&E and Merrick maintained over its subcontracted workforce.

25

**5.   Whether Service Rendered is Integral**

This factor considers whether the services rendered by the workers were "an integral part" of Defendants' business.  *Keller*, 781 F.3d at 815 (citing *Brandel*, 736 F.2d at 1119–20).  The Secretary argues that Padilla and the subcontractors were an integral part of J&E's workforce, confirmed by J&E's finances, as J&E spent $615,109 on "contract labor" which exceeded its spending on "wages" ($543,241).  The services rendered were likely integral to J&E and/or Merrick's business as they were among the main services J&E provided.

**6.   Permanency of Relationship**

The sixth factor, permanency of the working relationship, contrasts periods of temporary employment with a more long-term working arrangement.  "Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationships is continuous and indefinite in duration."  *Keller*, 781 F.3d at 807 (citing *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (internal quotation marks omitted)).  If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor.  *Id.* (*see Brandel*, 736 F.2d at 1117).

The Secretary argues that J&E's short-lived operation of nine months renders this factor less important, because it was impossible for any person to have a long-term relationship with J&E.  Padilla attested that during the time he worked for J&E, he worked exclusively for J&E on four different projects.  Defendants argue that Padilla's receipts show he derived significant revenue from other companies during the time he claims he worked exclusively for J&E.

(Motion for Summary Judgment, Doc. 74 at PageID 3794–95.)  Again, a dispute of fact exists about the exclusiveness of Padilla's work with Defendants.

### 7. Additional Factors

The parties also argue whether the additional factors of determining the rate of pay and maintaining employment records support a finding of employment.  Disputes of fact preclude a finding on whether these factors favor independent contractor or employee status.  According to Antonio Lemus-Cervantes, J&E did not tell Padilla or any subcontractor who they should hire or fire or how much to pay workers.  (Lemus-Cervantes Dec., Doc. 73-1 at PageID 3692.)  J&E foremen "verified" hours worked by subcontractors.  (House Dep., Doc. 72 at PageID 3654.)  As previously noted, J&E foremen completed daily safety reports[20] in which admitted employees were listed alongside subcontractors as being under the supervision of J&E foremen.  (Daily Safety Reports, Doc. 72-11.)  In a text message, Merrick directed Padilla to "stay where you are and bring more finishers."  (Text Messages, Doc. 71-4 at PageID 2803.)  Padilla attested that Merrick told him how many workers she needed and where she needed them, and she paid him $23 per hour for all work performed by him and the workers he brought, and he paid the workers a little less than that.  (Doc. 81-5 at PageID 4958.)  Disputes of fact, therefore, preclude a finding on these additional factors.

### B. Joint Employer

---

[20] Defendants argue the daily safety reports are not evidence of employment records.  (Doc. 72-12 at PageID 3359–76.)  Under 85 Fed. Reg. 2820, "employment records" means "records, such as payroll records, that reflect, relate to, or otherwise record information pertaining to the hiring or firing, supervision and control of the work schedules or conditions of employment, or determining the rate and method of payment of the employee."  Joint Employer Status Under the Fair Labor Standards Act, 85 FR 2820-01 (effective March 16, 2020).  The safety logs list workers who attended the work site that day, and they were completed by J&E foremen.  Further, there are text message exchanges of Merrick receiving lists of time and calculations of hours worked by subcontractors from Padilla.  Combined, these demonstrate evidence of J&E and/or Merrick maintaining some employment records.

The Secretary alternatively argues that J&E is a "joint employer" of its purported subcontractors along with Padilla/Amazing Interiors.[21] "More than one 'employer' can be responsible for FLSA obligations." *United States v. Dep't of Labor v. Cole Enter., Inc.*, 62 F.3d 775, 778 (6th Cir. 1995). "[A] corporate officer who has operational control of the corporation's covered enterprise is an 'employer' under FLSA, along with the corporation itself." *Id.* The factors to be considered focus on the same as those determining employer status, and the Court has already determined questions of fact abound in consideration of those factors. *See Rhea v. W. Tenn. Violent Crime & Drug Task Force*, 825 F. App'x 272, 276 (6th Cir. 2020) (citing 29 C.F.R. § 791.2(a)(1)). The same disputes of fact previously identified in the Court's analysis on employee status preclude a finding of joint-employer liability.

### C. Merrick's Status as an "Employer"

The parties dispute whether Merrick is an "employer" under the FLSA. An employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "The FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." *Dole v. Elliott Travel &*

---

[21] As the Secretary identifies, the DOL issued a Final Rule on "Joint Employer Status Under the Fair Labor Standards Act" in January 2020 listing at least four criteria for consideration as to whether an employer is a joint employer: whether the person hires or fires the employee; supervises and controls the employee's work schedule or conditions of employment to a substantial degree; determines the employee's rate and method of payment; and maintains the employee's employment records. *See* 85 Fed. Reg. 2820. However, the district court for the Southern District of New York vacated portions of that rule on the ground that those portions were arbitrary and capricious in an action brought by seventeen states and the District of Columbia against the Department of Labor asserting the Joint Employer Rule violated the Administrative Procedure Act. *See New York v. Scalia*, 490 F. Supp. 3d 748 (S.D.N.Y. Sept. 8, 2020), *appeal pending*, No. 20-3806 (2nd Cir. Nov. 6, 2020). The DOL thereafter issued a Notice of Proposed Rulemaking considering recission of the Joint Employer Status Under the Fair Labor Standards Act Final Rule. *See* Recission of Joint Employer Status Under the Fair Labor Standards Act Rule, 86 Fed. Reg. 14038 (Mar. 12, 2021). Although caselaw is limited within the Sixth Circuit, the District Court for the Eastern District of Michigan agreed with the *Scalia* ruling and instead applied the existing Sixth Circuit economic reality test to the question of whether a company was a joint employer. *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 783 (E.D. Mich. Jan. 12, 2021).

*Tours, Inc*., 942 F.2d 962, 965 (6th Cir. 1991), *superseded by rule on other grounds*, *M.J. v. Akron City Sch. Bd. of Ed*., 1 F.4th 436 (6th Cir. June 15, 2021) (quoting *Falk v. Brennan,* 414 U.S. 190, 195 (1973)).  In deciding whether a party is an employer, the "economic reality" controls.  *Id.* (citing *Goldberg v. Whitaker House Cooperative,* 366 U.S. 28, 33 (1961)).  Whether a party is an employer within the meaning of the FLSA is a legal determination.  *Id*.

"The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages."  *Id*. (quoting *Donovan v. Agnew,* 712 F.2d 1509, 1511 (1st Cir. 1983)).  "In *Agnew,* the court determined that corporate officers with a significant ownership interest who had operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of non-payment were employers under the FLSA."  *Id*. (quoting *Agnew*, 712 F.2d at 1514 (internal quotations removed)).  "No one factor is dispositive; rather, it is incumbent upon the courts to transcend traditional concepts of the employer employee relationship and assess the economic realities presented by the facts of each case."  *Id*. (citing *Donovan v. Sabine Irrigation Co*., 695 F.2d 190, 195 (5th Cir. 1983) (whether party is employer is question of fact), *cert. denied*, 463 U.S. 1207 (1983)).  A party need only have "operational control of significant aspects of the corporation's day to day functions" as opposed to exclusive control of those functions in order to be considered an employer as a matter of economic reality.  *Id.* at 966.  Under this test, the Court looks to the circumstances of the business as a whole, including the following non-exhaustive and non-dispositive factors:

(1) whether the plaintiff is an integral part of the operations of the putative
employer;
(2) the extent of the plaintiff's economic dependence on the defendants;
(3) the defendant's substantial control of the terms and conditions of the work of
the plaintiff;
(4) the defendant's authority to hire or fire the plaintiff; and
(5) whether the defendant maintains the plaintiff's employment records and
establishes the rate and method of payment.

*Miller v. Food Concepts Int'l, LP,* No. 2:13-CV-00124, 2017 WL 1163850, at *27 (S.D. Ohio

Mar. 29, 2017) (citing *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012));

*see also Clark v. Shop24 Global, LLC*, 77 F. Supp. 3d 660, 689 (S.D. Ohio 2015).

Merrick argues that she had no ownership interest in J&E and therefore cannot be held

liable as an employer. But ownership interest is not dispositive. An individual who exercises

significant operational control may still be held liable as an employer. *See Donovan v. Brandel,*

736 F.2d 1114, 1116 (6th Cir. 1984) (noting employment relationships do not lend themselves to

"a precise test" but should instead "be determined on a case-by-case basis upon the

circumstances of the whole business activity"); *Myers v. Mem'l Health Sys. Marietta Mem'l*

*Hosp.*, No. 2:15-CV-2956, 2019 WL 1125665, at *3 (S.D. Ohio Mar. 12, 2019) (finding

corporate officers of a hospital system with significant operational control to be "employers"

under the FLSA); *Benion v. LeCom*, *Inc*., 336 F. Supp. 3d 829, 855–56 (E.D. Mich. Sept. 30,

2018) (fact question over employer status for individual who did not have ownership interest in a

company but was otherwise cast as a "top man" in the company); *Reich v. Circle C. Investments,*

*Inc*., 998 F.2d 324 (5th Cir. 1993) (defendant lacked an ownership interest and control of day-to-

day operations but was still an employer because he exercised sufficient "control over the work

situation" and was the "driving force" behind the business); *but see Miller v. Food Concepts*,

2017 WL 1163850, at *28 (manager-level employees not employers under FLSA).

The Court finds there is a significant question of fact as to the amount of operational control Merrick had at J&E.  On one hand, she did not hold a corporate officer title or have ownership interest in J&E.  On the other hand, there is record evidence, identified above, that Merrick directed J&E employees and subcontractors where and when to work, determined pay rates, and determined how much to pay subcontractors' work hours.  (*See, e.g.,* Doc. 77 at PageID 4028–29; Doc. 806 at PageID 4738.)  Merrick was the registered agent for J&E, and the owner of J&E had another job in addition to running J&E.  There is testimony that general contractors who worked with Merrick believed her to be in charge.  Thus, a dispute of fact exists over whether Merrick was an "employer" under the FLSA and how much control she had over J&E's day-to-day functions.

### D.  J&E as a Successor to MICA

In the Sixth Circuit, "the appropriateness of successor liability depends on whether the imposition of such liability would be equitable." *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006).  To determine the applicability of successor liability in the employment context, courts balance "1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) the goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue." *Id.* (citing *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir. 1974)).  In balancing these competing interests and goals, courts consider a number of relevant factors, including:

> (1) whether the successor company has notice of the charge; (2) the ability of the predecessor to provide relief; (3) whether the new employer uses the same plant; (4) whether there has been substantial continuity of business operations; (5) whether the new employer uses the same or substantially same workforce; (6) whether the new employer uses the same or substantially same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether [the defendant] uses the same machinery, equipment and

methods of production; and (9) whether [the defendant] produces the same product.

*Clark*, 77 F. Supp. 3d at 693 (quoting *Cobb*, 452 F.3d at 554)).  "Each factor is not relevant in every case, and '[t]he ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy.'" *Id*. (quoting *Cobb*).

Defendants argue that the imposition of successor liability to J&E would be inequitable and disregard the factors above.  Defendants contend the Secretary has no evidence that J&E had notice of MICA's charge, formal or otherwise, because there is no evidence that J&E or House, as the sole owner, had notice or was served notice of the charges against MICA.  In *Clark v. Shop24 Global, LLC*, the court found that it was reasonable to infer the successor company was on notice of potential claims at the time it acquired the predecessor company where there was continuity of business operations between the two.  77 F. Supp. 3d at 693 n.14.  In that case, the plaintiff presented evidence that his responsibilities, working conditions, and supervisor did not change despite a transfer of assets, and the defendant continued to employ the same workforce, operate in the same manner, and provide the same product as its alleged predecessor.  *Id*. at 693–94.  Some factors were disputed, but the plaintiff presented sufficient evidence to create a genuine issue of material fact as to whether the defendant was subject to successor liability.  *Id.*

In this case, there is conflicting evidence about whether the alleged successor company, J&E, has "notice" of the charge.  There is not a dispute that Merrick had notice of the charges against her, or at least her potential liability for wage and hour violations by MICA.  According to Bogomolov's Declaration, he, on behalf of the Department of Labor, investigated MICA's compliance with its FLSA obligations, and Merrick participated in this investigation by sending

him checks on November 18, 2017.  (Doc. 81-11 at PageID 5044–46.)  Thus, whether J&E had

notice depends upon the resolution of questions of fact concerning Merrick's role in operating

J&E, the continuity of business operations between MICA and J&E, and whether Merrick is an

"employer."  The Secretary has presented evidence that some of the workforce remained the

same between the two companies and that Merrick exercised control over the operations of J&E

by managing the day-to-day business of J&E.  At this stage, the Court finds that there is enough

evidence to present a material question of fact as to whether successor liability applies, and it

would be premature to foreclose this potential equitable remedy.

## IV.    CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment (Doc. 74) is

**DENIED**.  Defendants' Motion to Strike the Declarations of Employee No. 1, Employee No. 2,

and Employee No. 3 and Exhibit Thereto (Doc. 90) is **DENIED AS MOOT**.  Defendants'

Motion to Strike the Declarations and Exhibits of Wage and Hour Division Investigator Nikolai

Bogomolov, Todd Haidet, Wayne McMillian, Mike Olding, Chris Kroger, and Gerardo Padilla

(Doc. 91) is **GRANTED IN PART AND DENIED IN PART**.

**Further, Plaintiff is hereby given NOTICE that the Court will DISMISS THE**

**CASE WITHOUT PREJUDICE against Defendant Timothy Thompson within 14 days of**

**entry of this Order unless Plaintiff demonstrates good cause for its failure to serve Timothy**

**Thompson.**

**IT IS SO ORDERED.**

S/Susan J. Dlott
Judge Susan J. Dlott
United States District Court

33